# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| NIKKIA J. KELSEY, §<br>§<br>   *Plaintiff,* §<br>§<br>*versus* §<br>§<br>CAROLYN W. COLVIN, §<br>Acting Commissioner of §<br>Social Security, §<br>§<br>   *Defendant.* § | CIVIL ACTION NO. 5:13-1128 |

## <u>MEMORANDUM OPINION</u>

Nikkia J. Kelsey ("Kelsey") seeks review of an adverse decision on her applications for disability-based social security benefits.

## I.  Judicial Review

A reviewing court's limited role under 42 U.S.C. § 405(g) is to determine whether (a) the Commissioner applied proper legal standards and (b) the decision is supported by substantial evidence.  *See Lamay v. Commissioner of Soc. Sec.*, 562 F.3d 503, 507 (2d Cir. 2009), *cert. denied*, 559 U.S. 962 (2010); *Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982); *see also* 42 U.S.C. § 405(g). Reviewing courts also must take "due account" of "the rule of prejudicial error." 5 U.S.C. § 706; *see also* 28 U.S.C. § 2111 (directing that judgments given upon examination of records be "without regard to errors or defects which do not affect the substantial rights of the parties"); *see also* FED. R. CIV. P. 61 (stating that "the court must disregard all errors and defects that do not affect any party's substantial rights").

## II. Background

Kelsey obtained an educational GED certificate.[1] Thereafter, she worked as a cashier, nurse's aide, and door-to-door salesperson. (T. 46, 210). In April 2009, at age 33, when leaving a residence after a sales call, she slipped backwards on stairs and grabbed a railing with her right arm. (T. 327). She did not fall, but her body twisted, immediately causing left shoulder, neck, upper and lumbar back pain. (*Id.*).

Kelsey pursued a state worker's compensation claim for on-the-job injuries. In September, 2009, she also applied for social security disability insurance benefits and supplemental security income,[2] alleging that she became unable to work as of April 6, 2009, due to "depression, stomach tumor, herniated disc in neck, nerve damage left arm & torn left rotator cuff, carpal tunnel right wrist, and extreme anemia." (T. 194).

Kelsey's claim was assigned to administrative law judge, Bruce S. Fein ("ALJ Fein"), who conducted an evidentiary hearing. (T. 37-90). Kelsey, represented by legal counsel, attended and testified. (*Id.*). ALJ Fein denied Kelsey's applications in a written decision dated February 2, 2012. (T. 20-31).

---

[1]     General Educational Development ("GED") tests are a group of subject tests which, when passed, certify that the test taker has high school-level academic skills. Generally, States award a Certificate of High School Equivalency or similarly titled credential to persons who meet the passing score requirements.

[2]     Disability Insurance, authorized by Title II of the Social Security Act and funded by social security taxes, provides income to insured individuals forced into involuntary, premature retirement by reason of disability. Supplemental Security Income, authorized by Title XVI of the Social Security Act and funded by general tax revenues, provides an additional resource to assure that disabled individuals' incomes do not fall below the poverty line.

The Appeals Council denied Kelsey's request for review. (T. 2-7). Kelsey then instituted this proceeding.

## III. Decision[3]

ALJ Fein first found that Kelsey met the insured-status requirements of the disability insurance benefits program at all relevant times.[4] (T. 22). Next, he found that Kelsey has severe physical and mental impairments. Her severe *physical* impairments included borderline left carpal tunnel syndrome, mild left cubital tunnel syndrome, left shoulder adhesive capsulitis post decompression and distal clavicle excision. (T. 23). Her severe *mental* impairment was depression. (*Id*.).

ALJ Fein found that Kelsey's physical impairments reduce her work capacity such that she can now perform work only at the sedentary exertional level. (T. 25). That capacity is further reduced by a nonexertional postural impediment consisting of limited ability to push and/or pull with the left upper extremity. Her nonexertional mental impairment allows her to tolerate only low stress and perform only simple tasks and instructions. (T. 25).

With this reduced residual functional capacity, ALJ Fein found that Kelsey can no longer perform her past relevant work as a salesperson (light

---

[3]     ALJ Fein utilized a five-step sequential evaluation procedure prescribed by regulation and approved by courts as a fair and just way to determine disability applications in conformity with the Social Security Act. The procedure is "sequential" in the sense that when a decision can be reached at an early step, remaining steps are not considered. *See* 20 C.F.R. §§ 404.1520, 416.920; *Bowen v. Yuckert*, 482 U.S. 137, 153 (1987) (citing *Heckler v. Campbell*, 461 U.S. 458, 461 (1983)). A full discussion of the Commissioner's five-step process is contained in *Christiana v. Commissioner of Soc. Sec. Admin.*, No. 1:05-CV-932, 2008 WL 759076, at *1-2 (N.D.N.Y. Mar. 19, 2008).

[4]     Disability Insurance benefits typically are more generous than Supplemental Security Income. Once ALJ Fein determined that Kelsey was fully insured, her claim for Supplemental Security Income effectively became moot.

exertional) or nursing assistant (medium exertional).  (T. 29).  ALJ Fein further found, however, that Kelsey can perform alternative, available work despite her impairments.  ALJ Fein relied on Medical-Vocational Guidelines, Section 201.28[5] and Social Security Ruling 96-9p[6] to make this finding  (T. 29-30).  Thus, Kelsey's application was denied.  (T. 31).

## IV.  Points of Alleged Error

Kelsey's brief presents three points of error (with subparts), as follows:

1.     The ALJ's RFC determination is not supported by substantial evidence:

    A.     The ALJ improperly discounted the opinion from treating surgeon, Dr. Cooke;

    B.     The ALJ improperly discounted the opinion from consultative examiner, Dr. Ross;

    C.     The ALJ's RFC determination is not consistent with his evaluation of the opinions from Drs. Carr, Wolf, and Setter;

---

[5]     The Medical Vocational Guidelines ("grids") are a matrix of general findings established by rule as to whether work exists in the national economy that a person can perform. When properly applied, they ultimately yield a decision of "disabled" or "not disabled." *Zorilla v. Chater*, 915 F. Supp. 662, 667 & n. 2 (S.D.N.Y. 1996); *see also Bombard-Senecal v. Commissioner of Soc. Sec.*, No. 8:13-cv-649 (GLS), 2014 WL 3778568, at *4 (N.D.N.Y. July 31, 2014)(citing 20 C.F.R. pt. 404, subpt. P, app. 2, § 202.21 (directing a finding of "not disabled" for younger individuals capable of performing light work that have at least a high school education and can speak English).

[6]     This ruling states that "[l]imitations or restrictions on the ability to push or pull will generally have little effect on the unskilled sedentary occupational base." *See* SSR 96-9p, TITLES II AND XVI: DETERMINING CAPABILITY TO DO OTHER WORK –IMPLICATIONS OF A RESIDUAL FUNCTIONAL CAPACITY FOR LESS THAN SEDENTARY WORK, 1996 WL 374185, at *6 (SSA July 2, 1996). Additionally, the ruling lists the mental activities that are generally required by competitive, remunerative, unskilled work as:  understanding, remembering, and carrying out simple instructions; making judgments that are commensurate with the functions of unskilled work--*i.e.*, simple work-related decisions; responding appropriately to supervision, co-workers and usual work situations; and dealing with changes in a routine work setting.  (*Id.*, at *9).  The ruling provides that a less than substantial loss of the ability to perform any of the basic work activities may or may not significantly erode the unskilled sedentary occupational base.  (*Id.*).

> D. The ALJ's RFC determination is not consistent with his evaluation of the opinion provided by Dr. Croyle;

2. The ALJ erred in failing to make a proper credibility finding; and

3. The ALJ's Step 5 finding is not supported by substantial evidence.

(Dkt. No. 10, p. 1).

After considering Kelsey's arguments and the Commissioner's responses thereto on all points, the court concludes, for reasons that follow, that Kelsey's points of error I.A and I.C must be sustained.

# V. Residual Functional Capacity

Points of error I.A and I.C both implicate ALJ Fein's finding of Kelsey's "residual functional capacity." As a threshold matter, therefore, it is appropriate to define "residual functional capacity" and delineate how it is determined.

## A. *Residual Functional Capacity*

Administrative law judges assess and articulate claimants' "residual functional capacity" before considering whether severely impaired persons can perform their prior relevant work or alternative available work. This term of art refers to what claimants can still do in work settings despite physical and/or mental limitations caused by their impairments and any related symptoms, such as pain. *See* 20 C.F.R. §§ 404.1545, 416.945. Administrative law judges thus decide whether applicants, notwithstanding their severe impairments, have physical and mental abilities to perform activities generally required by competitive, remunerative work on a regular and continuing basis. *See* SSR 96–8p, TITLE II AND XVI: ASSESSING RESIDUAL FUNCTIONAL CAPACITY IN INITIAL CLAIMS, 61 Fed. Reg. 34474, 1996 WL 374184, at \*4 (SSA July 2, 1996).

When *assessing* residual functional capacity, an administrative law judge must consider "all of the relevant medical and other evidence." *See* 20 C.F.R. §§ 404.1545(a)(3), 416.945(a)(3). All impairments, *i.e.*, both severe and nonsevere, must be factored into residual functional capacity determinations. *See* 20 C.F.R. §§ 404.1520(e), 404.1545, 416.920(e), 416.945; SSR 96–8ᴘ, 1996 WL 374184, at *5. Then, when *articulating* a claimant's residual functional capacity, administrative law judges must identify and evaluate a claimant's limitations relating to specific physical and mental functions that correspond with ordinary work activities. *See* 20 C.F.R. §§ 404.1545, 416.945; *see also* SSR 96–8p, 1996 WL 374184, at *1. These functions include *physical* abilities such as sitting, standing, walking, lifting, carrying, pushing, pulling, or other physical functions, *mental* abilities such as understanding, remembering, carrying out instructions, and responding appropriately to supervision, and *other* abilities that may be affected by impairments, such as seeing, hearing, and the ability to tolerate environmental factors. *See* 20 C.F.R. §§ 404.1545, 416.945; *see also* SSR 96–8p, 1996 WL 374184, at *5–6.[7]

B.  *Treating Physician Rule*

Residual functional capacity assessments usually are based largely on medical opinion. The Commissioner categorizes medical opinion evidence by "sources" described as "treating," "acceptable" and "other," and prescribes

---

[7]  When mental impairments are present, determinations of functional limitations stemming therefrom are accomplished in the aftermath of application of a "special technique" set out in 20 C.F.R. §§ 404.1520a(b)-(e), 416.920a(b)-(e); *see also Kohler v. Astrue*, 546 F.3d 260, 265-66 (2d Cir. 2008) (describing analysis). This evaluative technique is not discussed further because points of error addressed in this opinion relate only to ALJ Fein's assessment of Kelsey's physical residual functional capacity.

hierarchical rules for weighing such evidence.[8] Under a popularly-denominated "treating physician rule," administrative law judges are required to give controlling weight to opinions of treating sources[9] regarding the nature and severity of impairments provided they are well-supported by medically acceptable clinical and laboratory diagnostic techniques and are not inconsistent with other substantial evidence in the case record. The Commissioner's regulation states:

> [W]e give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals *most able to provide a detailed, longitudinal picture of your medical impairment(s)* and may bring *a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations*, such as consultative examinations or brief hospitalizations.

20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2) (emphasis added).

For good cause, administrative law judges may decline to afford treating physician opinions controlling weight, but in such instances they must then determine *how much weight* such opinions are due by applying certain relevant factors prescribed by regulation: (1) length of treatment relationship and frequency of examination; (2) nature and extent of treatment relationship; (3) evidence supporting the opinion; (4) how consistent opinion is with record as a whole; (5) specialization in contrast to condition being treated; and (6) other

---

[8]  20 C.F.R. §§ 404.1502,404.1513(a), 416.913(a), 416.902

[9]  *See* 20 C.F.R. §§ 404.1502, 416.902 ("Treating source means your own physician, psychologist, or other acceptable medical source who provides you, or has provided you, with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with you.").

significant factors.[10] Further, they must "comprehensively set forth . . . reasons for the weight assigned to a treating physician's opinion." *Burgess v. Astrue*, 537 F.3d 117, 129 (2d Cir. 2008) (internal alteration and citation omitted). They must "always give good reasons" for the weight given to a treating source's opinion, 20 C.F.R. § 416.927(c)(2), and "cannot arbitrarily substitute . . . [their]. . . own judgment for competent medical opinion." *McBrayer v. Secretary of Health & Human Servs.*, 712 F.2d 795, 799 (2d Cir. 1983).[11]

## C.  *Adequacy of Record*

Claimants possess rights to administrative records adequately developed to the point that fair and informed decisions can be reached thereon. Residual functional capacity findings, like all critical findings, cannot stand when based on an incomplete or otherwise deficient evidentiary record. Failure to develop the record adequately is an independent ground for vacating the Commissioner's decision. *See Moran v. Astrue*, 569 F.3d 108, 114–15 (2d Cir. 2009), ("We vacate not because the ALJ's decision was not supported by substantial evidence but because the ALJ should have developed a more comprehensive record before making his decision."); *see also Daviau v. Astrue*, No. 09–CV–0870 (MAD), 2012 WL 13543, at *6 (N.D.N.Y. Jan. 4, 2012).

---

[10]    *See* 20 C.F.R. §§ 404.1527(c), 416.927(c) ("Unless we give a treating source's opinion controlling weight under paragraph (c)(2) of this section, we consider all of the following factors in deciding the weight we give to any medical opinion.").

[11]    *See also Schaal v. Apfel*, 134 F.3d 496, 503–04 (2d Cir. 1998) (stating that the Commissioner must provide a claimant with "good reasons" for the lack of weight attributed to a treating physician's opinion); *Halloran v. Barnhart*, 362 F.3d 28, 32–33 (2d Cir. 2004) ("This requirement greatly assists our review of the Commissioner's decision and 'let[s] claimants understand the disposition of their cases.' ") (quoting *Snell v. Apfel*, 177 F.3d 128, 134 (2d Cir. 1999)).

"Social Security disability determinations are investigatory, or inquisitorial, rather than adversarial." *See Moran*, 569 F.3d at 112–13. It is the ALJ's duty to investigate and develop facts and develop arguments both for and against granting of benefits. "This duty arises from the Commissioner's regulatory obligations to develop a complete medical record before making a disability determination, 20 C.F.R. § 404.1512(d)-(f) (1995), and exists even when, as here, the claimant is represented by counsel." *See Pratts v. Chater*, 94 F.3d 34, 37 (2d Cir. 1996) (citing *Perez v. Chater*, 77 F.3d 41, 47 (2d Cir. 1996)).

Correlative to this duty, administrative law judges must recontact treating physicians or other medical sources, and request additional information when evidence in hand is inadequate to determine whether claimants are disabled. 20 C.F.R. §§ 404.1512(e), 404.1520b(c); *see also Schaal v. Apfel*, 134 F.3d 496, 505 (2d Cir. 1998) (when there is an inadequate medical record, an administrative law judge must *sua sponte* seek additional information). This affirmative obligation does not extend to infinity, however, and is not without limit. Administrative law judges are not required to seek additional information absent "obvious gaps" that preclude an informed decision. *Rosa v. Callahan*, 168 F.3d 72, 79 n.5 (2d Cir. 1999); *see also Hart v. Commissioner of Soc. Sec.*, No. 5:07–CV–1270 (DNH), 2010 WL 2817479, at *5 (N.D.N.Y. July 10, 2012).

## VI.  Medical Evidence

A tedious recapitulation of voluminous medical evidence is a painful exercise for the reader and scrivener alike. In this instance, however, a chronological summary of the course of Kelsey's medical treatment is important. It portrays a protracted, worsening condition never fully explained by objective medical findings or remedied by repeated surgical intervention. This

circumstance inevitably complicated AlJ Fein's assessment of residual functional capacity.

Following her reported mishap at work, Kelsey immediately sought medical attention, and continued to do so for over three years. During a brief period beginning April 7, 2009, and continuing through June 4, 2009, she initially was seen by physician assistants and a supervising doctor (Ivan Wolf, M.D.) associated with a clinic named "Industrial Medical Associates." In addition, she underwent magnetic resonance imaging (MRI) testing of her left shoulder. These early treatment records recorded Kelsey's subjective complaints, and assessed her as having shoulder and cervical strains. After each visit, Kelsey was released to return to work with left-arm lifting, carrying, pushing and pulling restrictions (sometimes 10 pounds; sometimes 15 pounds) and no reaching above shoulder level.

Kelsey's June 1, 2009, MRI was interpreted as revealing some abnormalities consistent with a partial tear of the supraspinatus.[12] Three days later, Kelsey was "discharged to the care of the orthopedist." (T. 314). During the next nine months, Kelsey was evaluated by at least seven specialists associated with different medical facilities. She was first seen by Daniel L. Carr, M.D., an orthopedist practicing in a group named "CNY Orthopedic Sports Medicine." Dr. Carr's clinical notes suggested that Kelsey might be exaggerating

---

[12]     The supraspinatus muscle runs horizontally from the top of the scapula to the top of the humerus. *Dorland's Illustrated Medical Dictionary*, 1211 (32d ed. 2012). The supraspinatus tendon is the tendon that connects the supraspinatus muscle to the top of the humerus and to the clavicle. *See Dorland's,* 1193, 1201.

or imagining her symptoms,[13] but he, like Dr. Wolf, restricted Kelsey to no greater lifting than 10 pounds and no reaching, pulling or lifting overhead with her left arm.  (T. 351).

Next, Kelsey was evaluated by Rina C. Davis, M.D., a pain management consultant affiliated with "New York Spine & Wellness Center."  Dr. Davis's "initial impression" was "supraspinatus tendinosis and myofascial pain syndrome of the left upper quarter."  (T. 363).  Dr. Davis ordered a cervical MRI and EMG[14] conduction study, changed Kelsey's pain medications, recommended a TENS[15] unit, and directed Kelsey to continue with physical therapy.[16]

Kelsey was seen once on September 24, 2009 by a shoulder and elbow specialist, Kevin Setter. M.D.  Dr. Setter, affiliated with "Upstate Medical Center," noted Kelsey's subjective complaints and conducted a physical examination.  He observed positive Neer and Hawkins signs,[17] as well as limited

---

[13]     Dr. Carr stated, "Her pain seems out of proportion to clinical and MRI findings.... As she admits that she grabbed the railing with her right arm, I would expect her to have most of her symptoms on the right.... [S]urgically I do not see anything for us to do at this point."  (T. 350-51).

[14]     Electromyography ("EMG") is a diagnostic procedure to assess the health of muscles and the nerve cells that control them (motor neurons).

[15]     Transcutaneous electrical nerve stimulation ("TENS"): electrical stimulation of the skin to relieve pain by interfering with the neural transmission of signals from underlying pain receptors.

[16]     The cervical spine MRI revealed a small disc herniation posterior in the midline at the C6-7 disc level.  (T. 364)

        The EMG was reported as an "ABNORMAL BILATERAL ARM STUDY."  (T. 367).  While there was borderline-to-mild evidence of right carpal tunnel syndrome and left cubital tunnel syndrome, there was no evidence of a radial nerve abnormality, pronator teres of anterior interosseus syndrome, radiculopathy or myopathy.  (*Id.*).

[17]     The Neer and Hawkins tests are common assessments of shoulder joint impingement. Pain with either of these maneuvers suggests subacromial impingement and/or rotator cuff tendonitis.

range of motion.  Regarding the latter, he opined that it was "likely due to pain" because he found no evidence of adhesive capsulitis.  His diagnosis was:

> Partial thickness rotator cuff tear with impingement-like symptoms.  She also has myofascial pain associated with this.

(T. 369).  Dr. Setter recommended continued physical therapy and a subacromial injection.  And, in a follow-up workers' compensation initial report, he stated:

> I do not believe she can return to normal activities.  No lifting, pushing, or pulling with the left upper extremity. . . . I would describe her impairment at 25% secondary to the pain in the shoulder that she is having.

(T. 370).

Kelsey underwent an "independent medical examination" in her workers' compensation proceeding on October 12, 2009.  Jalel Sadrieh, M.D., diagnosed Kelsey as having myofascial pain involving primarily the left shoulder, cervical spine and left arm, and rated her prognosis as "guarded." (T. 382).  Dr. Sadrieh also made the following comments:

> I feel that her clinical complaints considerably outweigh the objective findings. . . .[B]ased on objective clinical findings, degree of disability is mild; however there is subjective overlay. . . . I feel that she can return to work light duty. . . There is no need for any further diagnostic testing or any surgical procedures. . . .

(T. 382-83).

Commencing in November, 2009, and continuing through March, 2010, Kelsey was evaluated by three physicians affiliated with Temple University's department of orthopaedic surgery and sports medicine.  She first saw E. Balasubramanian, M.D., who, on November 10, 2009, found that Kelsey exhibited "positive impingement sign, positive supraspinatus weakness and positive cross-arm adduction test." (T. 401).  Dr. Balasubramanian assessed

Kelsey as having "cuff tendinitis with impingement syndrome with the possibility of a tear and the MRI proven cervical disk herniation." (T. 402). Dr. Balasubramanian prescribed Vicodin for pain relief and referred Kelsey to other Temple doctors for cervical spine and shoulder evaluations. (T. 399).

Pursuant to Dr. Balasubramanian's reference, Kelsey was seen on January 19, 2010, by Milo Sewards, M.D. (T. 397-98). Dr. Sewards assessed Kelsey as suffering from neck and left upper extremity pain with MRI evidence of partial thickness supraspinatus tear. (T. 397). He commented, however, that Kelsey's articular-sided partial-thickness tear did not explain the extent of her pain. (T. 398).

The third Temple physician to evaluate Kelsey was F. Todd Wetzel, M.D. He saw Kelsey once in February, 2010, and twice in March, 2010. On March 16, 2009, Dr. Wetzel diagnosed Kelsey as suffering from neck pain with left upper extremity hypesthesia and left shoulder rotator cuff tendinosis. (T. 393). He did not think her symptoms were related to her MRIs but were more likely related to "some type of complex regional pain disorder or other nerve hypersensitivity type of issue." (*Id*.). On March 22, 2010, Dr. Wetzel suggested a "selective nerve block on the left," which Kelsey declined. (T. 391). Dr. Wetzel denoted Kelsey's workers' compensation disability as "moderate to marked 66⅔%." (T. 493).

On May 26, 2010, (more than 20 months prior to ALJ Fein's decision), Kelsey submitted to a forensic medical examination by Harris A. Ross, D.O., a state agency consultative examiner for the Commonwealth of PA/Bureau of Disability Determination. (T. 443-45). Dr. Ross evaluated all of Kelsey's physical and mental complaints, and based thereon, he completed a "Medical Source Statement of Claimant's Ability to Perform Work-Related Physical

Activities." (T. 447-48). Therein, he opined that Kelsey could lift and carry 10 pounds only occasionally, stand and walk only 1-2 hours, and sit less than 6 hours in an eight-hour work day. (T. 447). Further, she was limited in her upper and lower extremity in her ability to push and pull. (T. 447). Additionally, Dr. Ross found her limited in her ability to reach. (T. 448). He also found postural limitations, including only occasional bending, kneeling, and stooping and never crouching, balancing, and climbing. (*Id*.). Dr. Ross also stated that she had environmental limitations that precluded work in poor ventilation, heights, vibration, wetness, noise and humidity. (*Id*.).

Over a year later, Kelsey began a patient/treatment relationship with C. Perry Cooke, M.D., an orthopedic surgeon affiliated with a practice named "Syracuse Orthopedic Specialists." Between January 31, 2011, and September 23, 2011, (four days before ALJ Fein's evidentiary hearing), Dr. Cooke saw Kelsey on ten occasions, performed two left shoulder surgical procedures, referred Kelsey back to Dr. Davis for pain management, and to another entity for two months of physical therapy.

Early in that treatment relationship, Dr. Cooke's impression was similar to that of prior treating physicians. A treatment note on March 29, 2011, stated:

> Patient has diffuse weakness throughout the left upper extremity in all motor groups which is 4 out of 5. *She seems to be giving poor effort throughout the exam* and there is cogwheeling. . . . At this point, going with information I have available, no surgery or injections would be beneficial to this patient as she has degenerative discs and small disc herniations which are not causing any neurologic deficit. *Her physical exam findings are certainly out of proportion to her MRI findings* and I do not think any further treatment would benefit her for her neck. . . .

(T. 543). For workers' compensation purposes, Dr. Cooke assessed the percentage of her temporary impairment at only 25%. (*Id*.).

Approximately one month later, Kelsey presented continuing complaints regarding her left shoulder to Dr. Cooke. At that visit, Dr. Cooke observed that Neer impingement, Hawkins impingement and Crossover[18] impingement signs were all positive with global loss of range of motion in her left shoulder and arm (mild). Dr. Cooke scheduled arthoscopic surgery for April 27, 2011, and made this entry in the clinical treatment record:

> TOTAL DISABILITY – Beginning on date of surgery and then continuing until further notice.

(T. 535).

Surgery proceeded as scheduled. Thereafter, Dr. Cooke modified his diagnosis to "adhesive capsulitis; SLAP tear, type 1, Buford variant, impingement and chronic sprain at the AC joint." (T. 498). In a six-week follow-up visit, Dr. Cooke recorded Kelsey's continued complaints of pain, noted moderate limitation in her range of motion, and rated her "temporary impairment" at 100%. (T. 524-27). He recommended aggressive range of motion exercises for physical therapy. (T. 526-27).[19]

In a second follow-up appointment on July 11, 2011, Kelsey reported continued pain. She stated she was still going to physical therapy, but could not discern improvement. The pain experienced during physical therapy made her physically sick, and she had difficulty sleeping due to pain. She requested a referral to a pain clinic. (T. 520-22).

---

[18]     The Crossover impingement test puts stress on the acromioclavicular joint. Sharp pain can indicate a sprained or torn ligament or arthritis.

[19]     The record reflects that Kelsey underwent two months of physical therapy at Crouse Hospital/Liverpool Physical Therapy. (T. 500-15).

In a third follow-up appointment two weeks later on July 28, 2011. Kelsey reported continuing pain, stiffness and weakness. Dr. Cooke observed that her range of motion limitation was unchanged, and he again assessed her temporary impairment at 100%. (T. 517-19).[20]

In a fourth follow-up appointment on September 19, 2011, Dr. Cooke recorded Kelsey's continuing complaints of "dysfunction and/or pain in the LEFT shoulder/arm." (T. 550). Under "history of present illness," Dr. Cooke recorded the pain as being sharp in quality and moderate in severity. (*Id.*). Dr. Cooke noted that "[i]n general, the progression of the problem seems to be getting worse. Patient has limited and painful ROM." (*Id.*). Upon physical examination, he found that Kelsey had painful and limited range of motion, and the Neer, Hawkins and Crossover impingement signs remained positive. He assessed Kelsey as having "Adhesive Capsulitis Of Shoulder, 726.0; Pain Shoulder Joint, 719.41; Slap Lesion, 840.7; Surgical Aftercare Following Surgery of Musculoskeletal System, V58.78; Syndrome H Impingement, Shoulder, 726.2." (T. 552). He recommended a second surgical procedure: manipulation of left shoulder. (T. 553).

On September 23, 2011, Dr. Cooke performed a second surgical procedure, a "manipulation," under general anesthesia. Dr. Cooke recorded the following:

---

[20]     Upon referral from Dr. Cooke, Dr. Rina C. Davis with New York Spine & Wellness saw Kelsey twice in September, 2011. At the first visit on September 2, Dr. Davis prescribed medication, sought authorization for nerve conduction studies and "a variance for TENS unit." (T. 565). At the second visit, she added Voltaren gel to Kelsey's medications and recommended "selected cervical transforaminal nerve root blocks targeting the left C5 and C6 level with IV conscious sedation and fluorscopy." (T. 562). Dr. Davis also assessed Kelsey's temporary impairment at 100%. (T. 563).

     As recommended by Dr. Davis, Kelsey underwent EMG testing at New York Spine & Wellness on September 20, 2011. The report of that procedure indicated a "normal study" of EMG and NCV findings. (T. 556)

Procedure details: . . . EUA revealed a deficiency of 30 degrees of abduction external rotation. This did respond to a general but firm manipulation with palpable and at times audible lysis of adhesions, leading eventually to full range of motion.

(T. 554). Based on that result, Dr. Cooke found "no instability prior to or following the manipulation," and his postoperative diagnosis was: "left shoulder adhesive capsulitis status post decompression and distal clavicle excision." (T. 554).[21]

## VII.   Point I.A (Weighting of Treating Source Evidence)

With respect to Dr. Cooke, ALJ Fein stated:

Dr. Cooke opined that the claimant is totally disabled beginning on April 27, 2011 until further notice. I accord no weight to Dr. Cooke.

(T. 27).

### A.   Contentions

Kelsey argues that ALJ Fein erred when affording no weight to evidence from Dr. Cooke. Kelsey argues that ALJ Fein misconstrued Dr. Cooke's *preoperative* treatment note referring to *temporary* disability attributable to surgery itself as an opinion of *permanent* impairment-caused disability. Invoking the "treating physician rule," Kelsey then compares Dr. Kelsey's expertise, treatment relationship, post-surgery treatment notes and objective clinical findings to regulatory factors prescribed for weighing treating source opinion, and concludes that "it was improper for the ALJ to entirely discount the opinion from Dr. Cooke, a man who was well-familiar with Plaintiff's left

---

[21]     The record before ALJ Fein did not contain a medical source statement from Dr. Cooke assessing Kelsey's ability to perform work-related physical activities following the second surgical procedure performed only 4 days before the evidentiary hearing.

shoulder impairment." (Dkt. No. 10, pp. 12-14). She further contends that ALJ Fein should have recontacted Dr. Cooke to have him render an opinion on how Kelsey's two surgeries affected her work-related abilities, and whether or not she recovered from the second. (*Id.*).

The Commissioner's brief responds that the "treating physician rule" does not extend to ultimate-issue opinions of disability. The Commissioner next argues that ALJ Fein's decision explained the consideration he gave to Dr. Cooke's opinion, and provided good reasons for rejecting it. The Commissioner further argues that the record lacks objective medical evidence to support a finding of total disability. Finally, the Commissioner argues that ALJ Fein had no duty to recontact Dr. Cooke for clarification because evidence in hand was adequate to determine whether Kelsey was disabled.

B.    *Discussion*

The court concludes that these litigants inadvertently have debated a "red herring," *i.e.*, a mostly irrelevant topic tending to divert attention from the central issue and induce false forensic conclusions. Viewed in proper context, Dr. Cooke's "total disability" opinion clearly was situational, relating solely to foreseeable and temporary effects of imminent surgery. It was not intended as an expression of permanent and total impairment-caused disability as understood in the social security arena, but rather as a restriction from physical activities during recuperation and until the degree of success of invasive surgery could be ascertained. For present judicial-review purposes, therefore, it is pointless to weigh the competing arguments summarized above with respect to Dr. Cooke's narrowly-centered statement that Kelsey was totally disabled "until further notice." A much more relevant and pressing issue, which both parties

recognize but treat almost summarily, is whether the record was adequately developed for ALJ Fein to make a fully-informed residual functional capacity finding.

Neither Dr. Cooke nor any other medical source expressed an opinion regarding Kelsey's capacity for engaging in ordinary physical functions typically associated with work activity following her two shoulder surgeries. The *only* medical source statement assessing Kelsey's ability to perform work-related activities in the social security context (as opposed to workers' compensation) was provided by a state agency consultative examiner, Harris A. Ross, D.O., well *before* Kelsey even began a patient relationship with the treating orthopedic surgeon, Dr. Cooke, and almost a year prior to her *first* surgery. Given the protracted course of Kelsey's treatment and her persistent complaints after conventional medications, conservative trials and *two* surgical procedures, Dr. Ross's opinion was stale. And, to further complicate matters, ALJ Fein concluded in any event that Dr. Ross's opinions merited little weight.[22]

*None* of the treating specialists who saw Kelsey prior to Dr. Ross's consultative examination provided medical source statements assessing Kelsey's ability to perform work-related activities in the social security context. Some (Dr. Wolf, Dr. Carr and Dr. Setter) released Kelsey to return to light duty with

---

[22] ALJ Fein rejected Dr. Ross's opinions regarding Kelsey's capacities for lifting, carrying, standing, walking, postural and environmental limitations, *etc.* on the basis that Dr. Ross did not perform a physical examination. ALJ Fein also discounted Dr. Ross's opinions because the limitations opined did not correlate to Kelsey's alleged impairments, and because he viewed the opinions as "not supported by the objective medical evidence and are more restrictive than the residual functional capacity contained herein." (T. 28).

Kelsey argues, and the Commissioner concedes, that ALJ Fein's impression that Dr. Ross "did not perform a physical examination on the claimant" was erroneous. Kelsey further argues that ALJ Fein erroneously was "playing doctor" when opining that limitations opined by Dr. Ross "do not correlate to the impairments alleged by the claimant."

restrictions for workers' compensation purposes. None provided a function-by-function assessment of the type required for assessing residual functional capacity. And, for reasons articulated above, that slim evidence was even more distant in time than Dr. Ross's stale consultative examination findings.

The mere fact that a new surgery intervenes between a consultative examiner's report and an evidentiary hearing does not automatically necessitate further record development in every case. Here, however, ALJ Fein was bereft of *any* medical source opinion that reasonably might be viewed as a competent assessment of the extent of Kelsey's current physical capabilities at the time of the evidentiary hearing. Reliance on early findings was patently unreasonable because those findings were temporally stale and substantively superseded by later objective findings by Dr. Cooke. The court concludes, therefore, that ALJ Fein erred in not developing a more comprehensive record before making a residual functional capacity finding.

Facially, this was a classic example of a case for recontacting a treating medical source for a current social security function-by-function assessment. Since Dr. Cooke treated Kelsey most recently and for the longest period, he logically would be most able to provide a detailed, longitudinal picture of Kelsey's medical impairments, and best positioned to bring a unique perspective to the medical evidence unobtainable from objective medical findings alone or reports of individual examinations by consultative examiners. Dr. Cooke possessed orthopedic expertise and personal knowledge. In addition to performing two surgeries on Kelsey's left shoulder (T. 489-99, 554), he treated Kelsey ten times (including 2 surgical procedures) from January 2011 through September 2011. (T. 516-39, 550-53). He was most familiar with her shoulder impairments and how they affected her on a regular basis. His treatment notes

reflect that, after the first surgery, she still had signs of positive Neer, Hawkins and Crossover impingement, as well as tenderness to palpitation and decreased range of motion with her left shoulder and arm, which is what ultimately led Dr. Cooke recommended additional shoulder surgery. He was uniquely positioned to assess Kelsey's physical capacities and limitations following the second surgical procedure, but was not asked to do so.

If ALJ Fein was uncomfortable about recontacting Dr. Cooke, he had other options for developing an adequate record. He could have referred Kelsey back to Dr. Ross or an entirely different physician for a fresh consultative examination and updated medical source statement. He could have tendered Kelsey's entire medical records to a state agency nonexamining medical consultant for a current assessment of Kelsey's abilities to perform work-related physical activities based on the longitudinal medical record.

ALJ Fein elected to pursue none of these options. His residual functional capacity assessment, therefore, was essentially based on lay impressions of Kelsey's current capacity for work. In so doing, ALJ Fein erroneously substituted his own judgment for competent medical opinion.[23] The court, therefore, must reverse and remand for further development of the record.

---

[23]    Absent professional medical opinion, Dr. Cooke's findings following the second surgical procedure and the "normal study" EMG and NCV findings at New York Spine & Surgery on September 20, 2011, do not necessarily support ALJ Fein's assessment of current residual functional capacity.

The fact that Dr. Cooke could, "with general but firm manipulation" eventually achieve a full range of motion while Kelsey was under general anesthesia in a hospital surgical suite, but, even then, only "with palpable and . . . audible lysis" does not provide evidence sufficient for a reasonable mind to accept of what a fully-conscious Kelsey could manage in the workplace without experiencing debilitating pain.

Similarly, normal EMG and NCV findings may rule out certain sources of debilitating pain, but professional medical opinion is necessary to inform an administrative adjudicator or reviewing court as to whether other sources may yet persist, e.g., what Dr. Wetzel cautiously described as "some type of complex regional pain disorder or other nerve hypersensitivity type of issue." (T. 393).

## VIII.   Point 1.C (Inconsistent Residual Functional Capacity  Finding)

Irrespective of an inadequately developed record, another deficiency in ALJ Fein's residual functional capacity assessment would warrant remand.  ALJ Fein purportedly accorded "great weight" to very early findings by Ivan Wolf, M.D., Daniel Carr, M.D., and Kevin Setter, M.D., of no objective evidence of serious shoulder injury.  In each instance, ALJ Fein stated that their "opinions" were consistent with the substantial weight of the medical evidence.[24]  (T. 26).

As reported earlier, all three doctors evaluated Kelsey early-on, and released her to return to light work.  They all imposed restrictions, however, prohibiting her from lifting overhead with her left arm.  Dr. Carr and Dr. Setter imposed additional restrictions precluding Kelsey from performing *any* pushing or pulling with her left arm.  ALJ Fein, however, included no overhead lifting limitation in his articulation of Kelsey's residual functional capacity, and he further found that Kelsey retained *limited* ability to push and/or pull with her left upper extremity.  (T. 25).

Kelsey's brief cites the court to the Commissioner's regulation, 20 C.F.R. § 405.370, that requires administrative law judges to prepare written decisions explaining in clear and understandable language specific reasons for their decisions.  Kelsey also cites an interpretive ruling, SSR 96-8p, stating that when a residual functional capacity assessment conflicts with an opinion from a medical source, an administrative adjudicator must explain why the opinion was not adopted.  Kelsey then argues that ALJ Fein erred when deciding to give "great weight" to "opinions" of Drs. Wolf, Carr and Setter, yet not adopting all their limitations or explaining why they were not.

---

[24]     ALJ Fein improperly conflated these physicians' lack of objective findings as their opinions of Kelsey's physical capacities for ordinary work activities.

The Commissioner's brief responds that omission of these limitations is of no consequence because they were not inconsistent with ability to perform sedentary work. The Commissioner cites another ruling, SSR 96-9p wherein the Commissioner has taken administrative notice of the fact that limitations or restrictions on one's ability to push or pull generally have little effect on the occupational base for unskilled sedentary work. The Commissioner further argues that inability to reach overhead with a non-dominant arm also would not significantly affect that occupational base since Kelsey still retains full use of her right, dominant arm up to the sedentary lifting restriction.

The court accepts the Commissioner's argument that SSR 96-9p constitutes substantial evidence supporting a finding that the occupational base for sedentary unskilled work is not significantly eroded by limitations on physical capacity to push or pull. Consequently, ALJ Fein's omission of such limitations in articulating Kelsey's residual functional capacity was, at best, harmless error.

The court further finds intrinsic appeal to the Commissioner's argument that a limitation against overhead reaching would not significantly erode the unskilled sedentary occupational base for persons who retain full use of their dominant extremities. The problem, however, is that the argument is *ipse dixit*. The Commissioner's brief cites no authority or evidentiary source for this assertion. Thus, the court has no way to know whether, absent the omission, ALJ Fein could still have relied upon the Medical-Vocational Guidelines to find that Kelsey could perform alternative jobs that exist in significant numbers in the national economy, or whether, instead, vocational expert testimony was necessary to determine how this additional limitation would have eroded Kelsey's potential occupational base. Under this circumstance, the court cannot conclude that ALJ Fein's failure to include an overhead lifting limitation – as

opined by all three medical sources to whom ALJ Fein afforded great weight –
without articulating a good reason for the omission was harmless error.

## IX.   Disposition

For reasons stated herein, the Commissioner's decision will be
REVERSED and REMANDED, pursuant to 42 U.S.C. § 405(g), sentence four, for
further proceedings.

Signed on the ____23____ day of ____January____ 2015.

_____
Earl S. Hines
United States Magistrate Judge